IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **NITROGEN SERVICES, LLC** § | | |
| § | **CIVIL ACTION NO. _____** | |
| Plaintiff, § | | |
| § | | |
| § | | |
| v. § | | |
| § | | |
| **AIR COMPRESSOR EQUIPMENT** § | | |
| **COMPANY and BRICE JONES,** § | | |
| an individual § | | |
| § | | |
| Defendant. § | **JURY DEMAND** | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE COURT:

COMES NOW NITROGEN SERVICES, LLC ("Nitrogen Services") and files this ORIGINAL COMPLAINT against AIR COMPRESSOR EQUIPMENT COMPANY ("ACEC") and BRICE JONES ("Jones") (hereinafter collectively, "Defendants") and in support thereof would respectfully show unto the Court the following:

**PARTIES**

1. Nitrogen Services, LLC is a Texas corporation with its principal place of business at 921 N. Fairgrounds Road, Midland, Texas 79706.

2. Air Compressor Equipment Company is an Arkansas company with its principal place of business at 3401 Kelley Highway, Fort Smith, Arkansas 72914.  Air Compressor Equipment Company may be served with process by serving a copy of the Complaint at this address.

3. Brice Jones ("Jones") is an employee of ACEC and, upon information and belief, resided in Arkansas at all times relevant of this Complaint.  Upon further information and belief, Jones

resides at 1906 Hendricks Boulevard, Fort Smith, Arkansas 72903-3416. Jones may be served wherever he may be found.

## JURISDICTION AND VENUE

4. This court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a). No defendant is a citizen of the same state as Plaintiff, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5. This Court also has jurisdiction under Title 28 U.S.C. §§1331 and 1367 in that it is a civil action arising under the laws of the United States of America. More particularly, the Defend Trade Secrets Act, 18 U.S.C. §1836(c) vests original jurisdiction of civil actions brought under the section to the district courts of the United States.

6. Under 28 U.S.C. § 1391(b)(2), venue is proper in the Western District of Texas because it is a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred…."

7. Further, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c)(2) because Defendant, ACEC, is a corporation. A corporation is deemed to reside in any judicial district where its contacts would be sufficient to subject it to personal jurisdiction at the time the action is commenced. ACEC advertised, promoted, and supplied their products at all times relevant in the State of Texas, and more particularly, within the jurisdictional boundaries of the United States District Court for the Western District of Texas.

## FACTUAL BACKGROUND

A. **NITROGEN SERVICES IS THE LEADER IN ONSITE NITROGEN GENERATION SERVICES.**

8. Nitrogen Services offers onsite nitrogen generation for use in pipeline commissioning, decommissioning, purging, ILI, tool motives, nitrogen blanketing and testing as well as plant and

refinery purging, testing and blanketing.[1] It serves customers across Texas, and throughout the country. Nitrogen Services was formed by Ron Booth ("Booth") in 2013 to combine nitrogen, pipeline cleaning, and pipeline freezing services into a single entity.

9. Mr. Booth is an expert in nitrogen generation systems. He has spent the last 29 years developing onsite nitrogen generation systems for use in the oil patch and other businesses and is considered to be a leader in the onsite nitrogen generations system field. From 1984 through 1994, Mr. Booth conducted research and development under a wholly owned subsidiary of BJB Company. The focus of his research was primarily, but not exclusively, on the development of nitrogen for use in pipeline services, plants in refineries, and was driven by the need to achieve greater cost and energy efficiencies over traditional supply by liquid transports.[2]

10. In 1994, Mr. Booth put the first N2 generator into service in the oil field.[3] His new technology exceeded all expectations, reducing costs on the order of 20% to 50% over the use of liquid supply.[4] And in 1998, he obtained a U.S. patent related to capturing nitrogen air using a gas separation membrane.[5]

11. Mr. Booth continued to research and engineer nitrogen membrane systems after continued dissatisfactions with the membrane generation units available on the market. He spent years and millions of dollars researching, testing, and improving his new technology.[6] His efforts included, but were not limited to, transporting compressor units to Connecticut to be tested with various membranes and commissioning research studies of membrane materials in St. Louis, Missouri and

---

[1] Exhibit 1, Booth Dec. ¶5.
[2] *Id.* ¶5.
[3] *Id.* Booth Dec. ¶¶3-5.
[4] *Id.* ¶¶3-5.
[5] *Id.* Booth Dec. ¶6.
[6] *Id.* at ¶7.

at Sandia Laboratories in Albuquerque, New Mexico.[7] The efforts of his research were reviewed by the University of Texas, Texas Tech University and Texas A&M University. The result of Mr. Booth's dedication was his own nitrogen membrane system.[8]

12. Mr. Booth's membrane generation unit has the ability to maintain balance of the filter and feed system, produce higher purities, higher flow and lower dewpoints.[9] This balance mastered by Mr. Booth produced purer nitrogen at a higher rate and volume than competitors are able to provide, which is important to pipeline operators.[10] Mr. Booth's membrane generation unit is also spatially different from any other system on the market which allows Nitrogen Services to easily service the parts of the membrane and feed system after it is manufactured.[11]

13. After engineering his membrane generation unit, Mr. Booth reached out to ACEC to manufacture his custom system.[12] Mr. Booth designed the system for Nitrogen Services to provide service to their pipeline operators, but Nitrogen Services is not a manufacturer.[13] Therefore, a company like ACEC was necessary to assemble and integrate the membrane generation unit and install it on trucks.[14]

### B. ACEC IS A MANUFACTURER OF COMPRESSION PACKAGES.

14. ACEC is a manufacturer of compression packages in various markets.[15] ACEC manufactures and distributes industrial compressors and portable construction equipment to

---

[7] *Id*. at ¶7.
[8] *Id*. at ¶7.
[9] *Id*. at ¶8.
[10] *Id*. at ¶8.
[11] *Id*. at ¶8.
[12] *Id*. at ¶10.
[13] *Id*. at ¶10.
[14] *Id*. at ¶10.
[15] *Id*. at ¶`13.

companies engaged in manufacturing, food processing, maintenance, air drilling, pipeline, construction, power generation and oil and gas refining.[16]

15. After noticing that ACEC was a supplier of compressor and booster packages on various projects in the Permian Basin, Mr. Booth approached Defendants about them potentially manufacturing mobile nitrogen generators for Nitrogen Services with Mr. Booth's membrane filter and feed system.[17] Prior to engaging with Nitrogen Services, ACEC had never built the membrane generation unit portion of any nitrogen generators. ACEC had previously supplied entire generators from another packager, Generon, in Houston.

### C. Mr. Booth Discloses His Proprietary Design to Defendants For them To Build.

16. Mr. Booth reached out to ACEC in early 2014 for the purpose of engaging ACEC to build his membrane filter and feed system.[18] Defendant Jones was the primary contact with whom Mr. Booth corresponded with regarding the manufacturing.[19] Mr. Booth and Defendant Jones had a clear understanding that Nitrogen Services would provide its proprietary design, which utilizes Mr. Booth's knowledge and expertise in membrane technology systems.[20] Defendant Jones agreed that Mr. Booth's proprietary information would not be used directly or indirectly for anyone else because doing so would destroy Nitrogen Services' competitive advantage, efforts and money and spent developing the technology.[21] Defendant Jones also agreed that he would —and did—inform ACEC employees of this as well.[22] Mr. Booth and Defendant Jones agreed to all to keep Nitrogen

---

[16] *Id.* at ¶13.
[17] *Id.* at ¶14.
[18] *Id.* at ¶14.
[19] *Id.* at ¶16.
[20] *Id.* at ¶15.
[21] *Id.* at ¶15, see Booth Dec. Exhibit B, pgs. 2-3; ¶¶17-18.
[22] *Id.* at ¶15.

Services' membrane generation unit confidential so that Nitrogen Services' unique position in the marketplace would not be damaged.[23]  Defendant Jones fully understood and agreed to these terms.[24]

17. In order to help Defendant Jones better understand the membrane separation process, Mr. Booth introduced Defendant Jones to his contacts in the industry.[25]  Mr. Booth did so with the expectation that it would help Defendant Jones produce higher quality units for Nitrogen Services. When Mr. Booth was introducing Defendant Jones to his contacts, he often presented Defendant Jones as a consultant of Nitrogen Services, not as an employee of ACEC.  Prior to Mr. Booth's effort to introduce him, Defendant Jones had no previous knowledge of these contacts, and no past or current business arrangements with any of them.[26]  Mr. Booth also introduced Defendant Jones so that ACEC could be designated as an original equipment manufacturer ("OEM") so ACEC could buy directly from these contacts to build Nitrogen Services' membrane systems.[27]

18. Chief among these contacts was a supplier of membrane separation modules.[28]  Nitrogen Services has not disclosed the identify of this supplier due to the public nature of this filing because the use of supplier's products is one aspect that provides Nitrogen Services with a competitive edge.  Defendant is aware of the identity of the supplier and the competitive advantage Nitrogen Services receives by purchasing from this supplier.  Nitrogen Services has worked with this supplier since 1994, purchasing membrane modules as well as working with the supplier's research and development group testing their materials.  Mr. Booth promoted Defendants to this supplier

---

[23] *Id.* at ¶15.
[24] *Id.* at ¶¶15, 16-17.
[25] *Id.* at ¶16.
[26] *Id.* at ¶16.
[27] *Id.* at ¶16.
[28] *Id.* at ¶16.

so Defendants could become an OEM and purchase the supplier's membranes to be used on the membrane generation systems designed by Mr. Booth.[29]  Defendants did purchase nitrogen separation modules from this supplier to be used on Nitrogen Services' membrane generation systems.

19. In addition to introducing Defendants to the absolute best suppliers, Nitrogen Services' agreement with Defendants gave Defendants one of the largest contracts they have ever exercised.[30]  In order to carry out this agreement, Nitrogen Services has furnished plans and renderings for the fabrication of the membrane generation unit that Defendants had previously never built.  Nitrogen Services did so with the understanding and agreement that the technology, process and configuration would remain Nitrogen Services' trade secrets.[31]

   D.  **NITROGEN SERVICES PROTECTS ITS TRADE SECRETS.**

20. A picture of Nitrogen Services' portable membrane generation is shown in Exhibit D of Mr. Booth's Declaration.[32]  The membrane and associated equipment Mr. Booth researched and developed is located in the middle of the trailer within the shipping container like structure. Nitrogen Services' trade secret and proprietary information are contained within that box and includes membrane technology and know-how that makes this system work in a superior fashion.[33] Nitrogen Services' membrane generation unit is able to produce more pure nitrogen at a higher pressure and volume, and in more severe environments (higher ambient temperatures) than the systems used by its competitors. For example, Omni Air and Nitrogen of Midland, Texas produces

---

[29] *Id.* at ¶17.
[30] *Id.* at ¶18.
[31] *Id.* at ¶18.
[32] *Id.* at ¶11; Booth Dec. at Exhibit D.
[33] *Id.* at ¶11.

nitrogen at a rate of 600-700 scfm using Generon nitrogen generation units.[34] By contrast, Nitrogen Services' membrane generation unit produces nitrogen at a rate of 2,200 scfm.

21. Due to the drastic production benefits of Nitrogen Services' systems compared with its competitors' systems, Nitrogen Services has gone to great lengths to protect the design of its proprietary membrane systems. First, Defendants agreed to confidentiality because they knew Nitrogen Services did not want its competitors to benefit from Mr. Booth's efforts developing this system.[35] Mr. Booth has had numerous conversations regarding the protection of his methodologies and technologies with Defendant Jones as well as with his father Johnny Jones of ACEC.[36] Defendants reiterated their acknowledgment of the need to keep Nitrogen Services' membrane generation systems confidential on numerous occasions. Defendant Jones acknowledged that nobody would be able to provide a trailer-mounted membrane generation unit that produced a greater nitrogen volume at the purity Nitrogen Services'.[37] Defendants agreed to keep Nitrogen Services' system confidential.[38]

22. Second, Nitrogen Services does not sell or lease its membrane generation unit to anyone due to its proprietary nature.[39] Nitrogen Services retains ownership of the equipment, does not allow access to customers or competitors, drives the units to the job-sites and operates the units

---

[34] Generon sells a membrane filter for companies like ACEC to integrate into a portable membrane generation unit. A picture of a Generon membrane filter contained in a nitrogen generation system is shown in the Booth Declaration at Exhibit E. *See* Booth Dec. at ¶12.
[35] *Id*. at ¶19; *see* Booth Dec. at Exhibit B.
[36] *Id*. at ¶18.
[37] *Id*. at ¶19; *see* Booth Dec. at Exhibit C.
[38] *Id*. at ¶¶14-19
[39] Id. at ¶11; *Id*. at ¶17.

themselves onsite.[40] When the membrane generation systems are not in operation in the field, the containers are closed and locked so that nobody may access them.[41]

23. Finally, prior to receiving the six membrane generation units from ACEC, Nitrogen Services let other companies, like Omni Air & Nitrogen, use its yard to store their heavy equipment. But, Nitrogen Services had everyone removed from the yard before it took delivery so they would not be able to inspect the membrane generation system.[42] Nitrogen Services has also installed fencing and barbwire around the property where the membrane generation units are located to prevent others from entering and reviewing the membrane generation unit.[43]

### E. DEFENDANTS GET GREEDY AND ARE ON THE VERGE OF MISAPPROPRIATING NITROGEN SERVICES'S TECHNOLOGY.

24. Despite Nitrogen Services giving Defendants one of their largest contracts to date (in addition to a wealth of other information), Defendants have become greedy and are on the verge of misappropriating Nitrogen Services' trade secrets.[44]

25. During a recent telephone conversation, Defendant Jones informed Mr. Booth that "he no longer felt compelled to keep [Nitrogen Services'] secrets" and that ACEC is in the final stages of building a system using Nitrogen Services' membrane generation system for a direct competitor of Nitrogen Services, Omni Air & Nitrogen. Defendant Jones stated- "I struggled with the decision as to whether to do this or not and, at the end of the day, I knew it would make you made and well…here we are."[45]

---

[40] *Id*. at ¶11.
[41] *Id*. at ¶20.
[42] *Id*. at ¶20.
[43] *Id*. at ¶20.
[44] To date, Nitrogen Services has hired ACEC to build six (6) Nitrogen Production Units for Nitrogen Services, and it has paid ACEC between $12.5 and $13 million for those units. *Id*. at ¶17.
[45] *Id*. at ¶21.

PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 9 OF 18

26. Defendant Jones contacted Mr. Booth again on February 19, 2019, and this time, he had the audacity to ask Mr. Booth for assistance with the technology for the Nitrogen Services' membrane generation units that he was building for Nitrogen Services' direct competitor, Omni Air & Nitrogen.[46]  Mr. Booth implored Defendant Jones not to sell the Nitrogen Services' membrane generation unit to Omni Air & Nitrogen and even offered to buy the unit from Defendants to prevent the sale from finalizing.[47]  Defendant Jones refused Mr. Booth's offer, believing he is required to sell the unit to Omni Air & Nitrogen because Omni Air & Nitrogen has waited months for it.[48]  During this same call, Defendant Jones informed Mr. Booth that Defendants were also in the midst of negotiating a deal to sell Nitrogen Services' membrane generation unit to additional competitors, including Haliburton and a company in Brazil.[49]

## CAUSES OF ACTION

### COUNT I.
### Breach of Contract- Failure to Maintain Confidential Information

27. Nitrogen Services realleges and incorporates by reference Paragraphs 1 through 26 as though fully set forth herein.

28. Plaintiff and Defendants have a valid and enforceable contract supported by valid consideration. Nitrogen Services hired Defendants to manufacture Nitrogen Services' membrane generation unit.  Nitrogen Services has paid Defendants between $12.5 and $13 million to date for the construction of six (6) membrane generation units.

29. Among other obligations under their agreement, Defendants agreed and were obligated to

---

[46] *Id*. at ¶23
[47] *Id*. at ¶23.
[48] *Id*. at ¶23.
[49] *Id*. at ¶24.

maintain the confidentiality of all confidential information. Specifically, Defendants agreed (on numerous occasions) not to disclose the technology, process and configuration of Nitrogen Services' trade secret.

30. The agreement reasonably protects Nitrogen Services' legitimate business interests, including its confidential technology and configuration of its membrane generation unit.

31. Nitrogen Services has fully performed its contractual obligations with Defendants under their agreement.

32. Defendants have violated the agreement by engaging in the exact action from which they agreed to refrain from, namely, that they failed to maintain the confidentiality of Nitrogen Services' membrane generation system. Instead, Defendants have used, disclosed and plan to use and disclose Nitrogen Services' membrane generation system to benefitting competing businesses such as Omni Air & Nitrogen. Defendants plan to continue exposing Nitrogen Services' trade secrets as they are currently negotiating with other competitors of Nitrogen Services to build Nitrogen Services' membrane generation system for those competitors.

33. Nitrogen Services has already suffered and will continue to suffer damages and irreparable harm as a result of Defendants' breach of contract, including loss of its business and contractual relationships, diminished value of its confidential information, and an unfair reduction in its competitive advantage.

34. Nitrogen Services' damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory and punitive relief.

35. Plaintiff is entitled to its attorneys' fees under Tex. Civ. Prac. & Rem. Code § 38.

36. Defendants' actions will continue to cause harm to Nitrogen Services if not restrained.

## COUNT II.
## Misappropriation of Trade Secrets

37. Nitrogen Services realleges and incorporates by reference Paragraphs 1 through 26 as though fully set forth herein.

38. The Texas Uniform Trade Secrets Act ("TUTSA") forbids the misappropriation of trade secrets.[50] Under the TUTSA, a trade secret constitutes:

> information including, but not limited to, a formula, pattern, compilation, program, device, method, technique, product, system, or process, design, prototype, procedure, or code that: (a) derives independent economic value, actual or potential, form not being generally known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[51]

39. Under the TUTSA, misappropriation constitutes:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (a) derived from or through a person who had utilized improper means to acquire it; (b) acquired by mistake or under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limits its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident of mistake.[52]

40. Certain confidential and proprietary information of Nitrogen Services constitutes trade secrets, under the TUTSA, including, but not limited to, its technology and configuration of its membrane generation system.

41. Nitrogen Services derives economic benefit from the fact that its trade secrets, including the technology, process and configuration of its membrane generation system which are not

---

[50] Tex. Civ. Prac. & Rem. Code Ann. § 134A.001, et seq.
[51] Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6).
[52] Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3).

generally known to individuals or entities outside of Nitrogen Services.

42. Nitrogen Services takes reasonable measures to protect the secrecy of such information. These measures include the regular use of locks on the membrane generation systems when the systems are not in operation, securing the storage locations of the membrane generation systems with barbwire fencing, revoking competitor's access to Nitrogen Services' storage facility prior to taking delivery of its membrane generation systems and limitations on dissemination of information on a need-to-know basis.  Nitrogen Services does not sell or lease its membrane generation system to anyone.  Nitrogen Services retains ownership of the equipment, does not allow access to customers or competitors, drives the units to the job-sites and operates the units themselves onsite.  Moreover, Mr. Booth specifically requested that Defendants keep Nitrogen Services' trade secrets confidential and protect such confidential information from any and all disclosures on multiple occasions.

43. Defendants knew they had a duty to maintain the secrecy of Nitrogen Services' trade secrets, due, in part, to their acknowledgement under their agreement.  Defendant Jones has acknowledged his understanding of the agreement on multiple occasions.

44. Despite Nitrogen Services' active steps to protect its trade secrets and Defendants' duty to maintain secrecy, Defendants have improperly disclosed and utilized Nitrogen Services' trade secrets and proprietary information, without consent of any kind, for their own financial gain, in direct violation of the TUTSA.  Defendants have contracted with a direct competitor of Nitrogen Services to sell Nitrogen Services' membrane generation unit the competitor.  Additionally, Defendants are in the midst of negotiations with other competitors of Nitrogen Services to sell Nitrogen Services' membrane generation system to more competitors.

45. Defendant Jones will continue to disclose and utilize Nitrogen Services' trade secrets in

the course of his employment with ACEC by using this information to manufacture Nitrogen Services' membrane generation system for Nitrogen Services' direct competitors. Defendant Jones has stated to Mr. Booth that he no longer feels compelled to keep Nitrogen Services' trade secrets.

46. Defendants' actions constitute threatened misappropriation in violation of the TUTSA.

47. Nitrogen Services has suffered damages and irreparable harm as a result of Defendants' breach of the TUTSA, including loss of customers and an unfair reduction in its competitive advantage.

48. Nitrogen Services is entitled to actual damages from Defendants, jointly and severally, and for attorneys' fees.

49. Nitrogen Services' damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

50. Defendants' actions will continue to cause irreparable harm and damages to Nitrogen Services and its trade secret information if not restrained.

## COUNT III.
## Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836

51. Nitrogen Services realleges and incorporates by reference Paragraphs 1 though 26 as though fully set forth herein.

52. The Defend Trade Secrets Act ("DTSA") of 2017, 18 U.S.C. § 1836, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate commerce."[53]

53. Under the DTSA, "trade secret" means "all forms and types of financial, business,

---

[53] 18 U.SC. §(b)(1) (as amended).

scientific, technical, economic, or engineering information, including patterns, plans, compilations, programs, or codes, whether tangible or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (as amended).

54. Under the DTSA, "misappropriation" means:

disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit he use of a the trade secret; or (III) derived from or though a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake.[54]

55. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."[55]

56. Certain confidential and proprietary information of Nitrogen Services constitutes trade secrets related to a product or service used in, or intended for use in, interstate commerce,

---

[54] 18 U.S.C. § 1839(5)(B) (as amended).
[55] 18 U.S.C. § 1839(6) (as amended).

including, but not limited to, its membrane generation systems.

57. Nitrogen Services derives economic value from the fact that its trade secrets, including its membrane generation unit's characteristics, are not generally known to individuals or entities outside of Nitrogen Services.

58. Nitrogen Services takes reasonable measures to protect the secrecy of such information. These measures include the regular use of locks on the membrane generation systems when the systems are not in operation, securing the storage locations of the membrane generation units with barbwire fencing, revoking competitor's access to Nitrogen Services' storage facility prior to taking delivery of its membrane generation systems and limitations on dissemination of information on a need-to-know basis.  Nitrogen Services does not sell or lease its membrane generation unit to anyone.  Nitrogen Services retains ownership of the equipment, does not allow access to customers or competitors, drives the units to the job-sites and operates the units themselves onsite.  Moreover, Mr. Booth specifically requested that Defendants keep Nitrogen Services' trade secrets confidential and protect such confidential information from any and all disclosures on multiple occasions.

59. Defendant Jones knew he had a duty to maintain the secrecy of Nitrogen Services' trade secrets due, in part, to his acknowledgement of such in email correspondence and conversations with Nitrogen Services employees.  Defendant Jones has acknowledged his understanding of the agreement on multiple other occasions and agreed it would not be used directly or indirectly for anyone else and that would—and did—inform ACEC employees of this as well.

60. ACEC is under a duty to maintain the secrecy of Nitrogen Services' trade secrets due, in part, of its employee's acknowledgement of such in email correspondence and conversations with Nitrogen Services employees.  ACEC is also under a duty not to disclose or misappropriate trade

secrets for the purpose of gaining a competitive advantage in the marketplace.

61. Defendants have already and will improperly disclose and use Nitrogen Services' trade secrets without consent of any kind for their own financial gain. Defendants have contracted with a direct competitor of Nitrogen Services to sell Nitrogen Services' membrane generation unit the competitor. Additionally, Defendants are in the midst of negotiations with other competitors of Nitrogen Services to sell Nitrogen Services' membrane generation system to more competitors.

62. Jones will continue to disclose and utilize Nitrogen Services' trade secrets in the course of his employment with ACEC by using this information to manufacture Nitrogen Services' membrane generation unit for Nitrogen Services' direct competitors, among other things. Defendant Jones has stated to Mr. Booth that he no longer feels compelled to keep Nitrogen Services' trade secrets.

63. Defendants' actions constitute threatened misappropriation in violation of the DTSA.

64. Nitrogen Services has suffered damages and irreparable harm as a result of Defendants' threatened breach of the DTSA, including loss of customers and an unfair reduction in its competitive advantage.

65. Nitrogen Services is entitled to actual damages from Defendants, jointly and severally, and for attorneys' fees.

66. Nitrogen Services' damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

67. Defendants' actions will continue to cause irreparable harm and damages to Nitrogen Services and its trade secret information if not restrained.

## **DEMAND FOR JURY**

68. Plaintiff hereby asserts its right to trial by jury and makes this demand for a jury trial.

Plaintiff will tender any required jury fee.

## **PRAYER**

Nitrogen Services prays for damages against Defendants as follows:

A. Breach of Agreement and lost profits as actual damages according to proof at trial;

B. Disgorgement of Defendants' unjust enrichment according to proof at trial;

C. Exemplary damages according to proof at trial;

D. Reasonable attorney's fees according to proof at trial;

E. Pre-judgment and post-judgment interest at the legal rate to the extent allowed under the law until paid;

F. Costs of the suit herein incurred; and

G. Such other and further relief as the court deems just and reasonable.

Dated: February 20, 2019

Respectfully submitted,

DANIELS & TREDENNICK LLP

By: */s/ John F. Luman III*
John F. Luman III
*Attorney-in-Charge*
State Bar No. 00794199
luman@dtlawyers.com
Douglas A. Daniels
Texas State Bar No. 00793579
doug.daniels@dtlawyers.com

6363 Woodway Drive, Suite 965
Houston, Texas 77057
(713) 917-0025 – Telephone
(713) 917-0026 – Facsimile